## PROWANT et al. v. SEALY et al.

Nos. 9046 and 10095—Opinion Filed Oct. 28, 1919.

Rehearing Denied March 9, 1920.

(Syllabus by the Court.)

**1. Oil and Gas—Lease—Construction.**

The paramount rule in the interpretation of contracts, which is to ascertain the intention of the parties and give effect to the same, if it can be done consistently with legal principles, is applicable to an oil and gas lease.

**2. Contracts—Construction.**

The intention of the parties must be deduced from the entire agreement, not from any part or parts of it, and where a contract has several stipulations, the intention of the contracting parties is not expressed by any single clause or stipulation, but by every part and provision in it, which must all be considered together, and so construed as to be consistent with every other part.

**3. Same.**

Where a contract is ambiguous, the true intention of the parties, if it can be ascer-

tained therefrom, prevails over verbal inaccuracies, inapt expressions, and the dry words of the stipulation.

**4. Same.**

The court must place itself, as far as possible, in the position of the parties when the contract was entered into, and consider the instrument itself as drawn, its purpose and the circumstances surrounding the transaction, and, from a consideration of all these elements, determine upon what sense or meaning of the terms used the minds of the contracting parties actually met.

**5. Same.**

Under section 951, Rev. Laws 1910, providing that the whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the others, an interpretation of a clause, even if not clearly obvious, must be adopted in preference to a construction which would not give any effect to it.

**6. Same—Ambiguity.**

If the contract is ambiguous or uncertain, and the intention of the parties is not clearly ascertainable from the instrument itself, the court may determine its proper interpretation and the construction from evidence adduced at the hearing showing the circumstances under which it was made, and the subject-matter to which it relates may be considered, and with these aids, the court should so interpret the contract as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as that intention is ascertainable and lawful.

**7. Same—Practical Construction.**

Where a contract, or any clause thereof, is uncertain and indefinite and the parties thereto, by their subsequent conduct or acts, have construed it, and such construction is within the purview of the language used, the courts will ordinarily adopt as controlling the construction made by the parties themselves.

**8. Appeal and Error — Evidence — Sufficiency.**

In an equitable action the findings of fact of the trial court will be sustained unless they are clearly against the weight of the evidence.

**9. Same.**

Evidence in this case examined and the weight thereof held to support the judgment of the trial court.

**10. Judges—Change of—Disqualification.**

Where parties seeking to disqualify a trial judge had knowledge of the alleged grounds for disqualification for more than three days prior to the trial and did not avail themselves of the procedure prescribed by section 5816, Rev. Laws 1910, they cannot urge the question of disqualification on appeal.

Error from District Court, Payne County; John P. Hickman, Judge.

Action by John Sealy and others against Charles M. Prowant and others. From judgment for plaintiffs, the defendants bring error. Affirmed.

West, Sherman, Davidson & Moore. Everest, Vaught & Brewer, C. B. Ames, W. D. Abbott, and J. P O'Meara, for plaintiffs in error.

B. B. Blakeney. Cottingham & Hayes, Embry, Crockett & Johnson, and George C. Greer, for defendants in error.

RAINEY, J. This action was commenced by the defendants in error, John Sealy. E. R. Brown, R. Waverly Smith. E. E. Plumly, and George C. Greer, as trustees for the Magnolia Petroleum Company, hereinafter called the plaintiffs, against the plaintiffs in error, Chas. M. Prowant, Eva S. Prowant, Walter Brown, Earle T. Miller, Henry N. Greis and Burke-Hoffeld Oil Company, hereinafter called defendants, seeking to enjoin the defendants from interfering with plaintiffs' possession of the land in controversy under an oil and gas mining lease. At the same time a similar action was commenced by the Fortuna Oil Company, as plaintiff, against Morton G. Custer et al., as defendants.

This controversy arose out of the following circumstances: On March 12, 1914, Chas. M. Prowant and wife executed to A. P. Crockett, an attorney of Oklahoma City, an oil and gas lease on the premises involved in the action first above mentioned, which was subsequently assigned by Crockett to the Magnolia Petroleum Company. This company made a location for well No. 1 on this lease in December, 1916. On the same date the Prowant lease was executed Morton G. Custer and wife gave Crockett a similar lease on the premises involved in the second action. This lease was subsequently assigned to the Fortuna Oil Company, which, at the time of the institution of this suit, had made its location for well No. 1 on said lease. Later these companies made additional locations on the leases, so that on March 12, 1917, there were two drilling wells on each lease. On December 27, 1916, Chas. M. Prowant and wife executed an option contract to Walter Brown, for a cash consideration of $1,000, giving the said Brown an option to purchase an oil and gas lease on his land on or before March 12, 1917, for a bonus of $20,000. On January 31, 1917, Morton G. Custer and wife made a similar contract with the said Brown and Earle T. Miller for a bonus of $25,000. It was upon receiving notice of the execution of these option contracts that the plaintiffs in

each of the above cases, who were at the time engaged in drilling on both said leases, brought their actions to enjoin the lessors and Brown and Miller from interfering with the plaintiffs' possession of the premises and to cancel the option contracts as clouds on plaintiffs' titles. The trial court rendered judgment for plaintiffs, from which the defendants have appealed to this court.

The material facts in the cases are substantially the same, but they involve different tracts of land and different parties. During the trial, by agreement, the evidence in one case was considered evidence in the other case so far as applicable, so the decision of the first named case will be controlling in the second.

The material facts covering the negotiations between the original parties to the lease are that sometime in February or March, 1914, Crockett began negotiations with the defendants in these cases and other landowners in what is hereinafter designated as the Yale field, which negotiations resulted in Crockett and fifteen of such landowners reaching an agreement by which oil and gas leases were to be given Crockett on their lands in this field in consideration of Crockett's proceeding to drill a test well to a depth of three thousand feet, unless oil or gas was found, or the Bartlesville sand reached, at a lesser depth. At the time of the negotiations the territory in which the lands were situated was approximately fifteen miles from the nearest producing well and was what is commonly denominated "wild-cat" territory. Prior to this time shallow wells had been drilled in the Yale field, but without discovering oil or gas in paying quantities, and all other prospectors who had secured leases on these particular lands had abandoned them. Several dry holes had been drilled in the immediate vicinity of the leases taken by Crockett, which had, in a measure, apparently condemned that section for oil and gas purposes. Under these circumstances there had been discussion among the landowners, who subsequently joined in executing the block of leases to Crockett leading to an implied understanding between them, if not an express agreement, to the effect that they would not lease again without receiving guarantees of the drilling of a well that would test the field. Crockett appears to have had an abiding faith that oil would be discovered in the field and the prospective lessors, being impressed with his earnestness in this respect, entered into an agreement with him for the drilling of a test well. Under this agreement Crockett executed his bond in the sum of $2,500, which was to be forfeited to the lessors as liquidated damages in the event he failed to

drill such test well in accordance with his agreement. The leases executed by the fifteen lessors, who entered into the contract with Crockett for the drilling of the test well, were deposited in escrow in the First National Bank of Yale, to be delivered to Crockett upon the commencement of the test well. In the briefs this contract is denominated the "escrow agreement." Under it Crockett further obligated himself, and the parties whom he represented, to commence within sixty days from the 20th day of February, 1914, the drilling of a test well upon some one of the tracts of the fifteen lessors, and to prosecute the drilling continuously in good faith until the test reached three thousand feet, unless paying sand was found at a lesser depth. It was further stipulated in the agreement that the test well was to be completed within one year from the date of its commencement. This well was begun within the specified time, and, in accordance with the terms of the escrow agreement, the leases executed by the fifteen lessors, among which were the two involved in these cases, were delivered by the bank to Crockett. The well was completed within the year prescribed, oil in paying quantities being found at a depth slightly in excess of three thousand feet. All the leases are substantially identical, the material parts of the Prowant lease being as follows:

"This Agreement, Made and entered into this 11 day of March, 1914, by and between Chas. M. Prowant and Eva S. Prowant, husband and wife, of Payne County, State of Oklahoma, lessors, and A. P. Crockett, of Oklahoma City, State of Oklahoma, lessee;

"Witnesseth: That the lessors, in consideration of the sum of one dollar ($1.00), to them in hand, well and truly paid by the lessee, receipt of which is hereby acknowledged, do hereby grant, demise, lease and let unto the lessee, his successors, heirs and assigns, all of the oil and gas in and under the following described tract of land, and also the said tract of land for the purpose and with the exclusive right of entering upon and operating thereon and removing therefrom said oil and gas and of laying pipe lines, building tanks, powers, stations, and structures thereon for producing, extracting, storing and disposing of said products, and with the right to use oil, gas and water therefrom. and all rights and privileges necessary or convenient for such operations; also the right to remove at any time all property, pipes, casing, materials, buildings and improvements placed or erected in or upon said land by the lessee, said land being all of that certain tract of land situate in Payne county. state of Oklahoma, described as follows, to wit:

"The south one-half of the northwest one-quarter of section 6, township 19 north, range 6 east, of the Indian Meridian, containing 80 acres more or less.

"**To have and to hold the same for and during the term of three years from the date hereof, and as much longer thereafter as oil or gas is found therein, or said premises developed or operated.**

*    *    *    *    *    *    *

"**If a well is not commenced on said premises within one year from the date hereof, this lease shall become null and void, unless the lessee shall pay or tender to the lessors a rental of $2.00 per acre quarterly in advance for such additional one year such commencement is delayed from the time above mentioned for the commencement of said well, until a well is commenced on said land. It is expressly agreed that the right to so extend and continue this lease is fully paid for by the consideration above mentioned, and that the said payment or tender, when made, shall fully and completely extend this lease from time to time until a well is commenced. The drilling of a producing well on said premises shall operate as a full liquidation of all rentals due or payable under this provision during the remainder of the term of this lease.**

"The completion of drilling operations which result in a dry hole or a well not producing oil or gas in paying quantities shall be in lieu of all rentals accruing from and after the date of the commencement of said operations; for a period expiring one year after the termination of said operations, and this lease shall be in full force and effect for said time as fully as if said rentals had been paid or a producing well completed." (Emphasis ours.)

It will be noted that under the second italicized clause of the lease the lessee is obligated to commence a well upon the tract of land covered by the lease or pay rental at the rate of $2.00 per acre, quarterly in advance, for each year the commencement of a well is delayed. The clause of the lease in which this provision occurs is clear and unambiguous and, standing alone, clearly does not require the completion of a well within one year or the payment of rentals, but only requires the commencement of a well within one year, or the payment of rentals for delay. and in this respect the lease is materially different from oil and gas leases that require the completion of a well within the designated time. But this clause, standing alone, does not specify for how long a period of time the lessee shall have the option to delay drilling by the payment of the rentals therein prescribed. This brings us to a consideration of another clause in the lease which expresses the agreement of the parties in this respect. This clause appears immediately after the granting clause and the description of the land covered by the lease. We w'll

designate it, as do the parties, "the habendum clause."

For the purposes of analysis and discussion counsel for defendants have subdivided this clause into four parts, as follows:

(1) To have and to hold the same for and during the term of three years from the date hereof; (2) and as much longer thereafter as oil or gas is found therein; (3) or said premises developed; (4) or operated.

Counsel for defendants say that if only clause 1 had been used the lease would have expired on March 10, 1917, even though it contained oil wells which were then being operated; that a definite term of three years would have been thereby fixed without any privilege of extension; and, therefore, clauses 2, 3, and 4 were intended to enlarge or extend the term provided the conditions described by said clauses came into existence. Thus far there can be no room for differences of opinion. Counsel then say: "Do the words in clause one (meaning clause 2) 'and as much longer thereafter as oil or gas is found therein' extend the life of the lease unless oil is found within the three years? Plainly not. And this is so plain that argument is useless." And we agree that counsel have also correctly stated the meaning of the words last referred to—that is, if the lessee prospects for oil and finds oil or gas on the leased premises before the expiration of the three-year period, the lease is extended beyond that term as long as oil or gas is found therein, provided, of course, that the oil or gas so found is run from the lease, as contemplated by the parties. With reference to clause 3, counsel for defendants contend that unless the premises are developed within the three-year period the lease is not extended and that by "developed" is meant "unfolded, laid open, disclosed;" in other words, that oil or gas has been found and extracted during said term. As to clause 4 they say that the words "or operated" mean that a well must have been drilled, oil or gas found, and the work of extracting the same must have been carried on during the three-year term in order to extend the lease. It will thus be seen that counsel give substantially and practically the same meaning to clauses 3 and 4 as they do to clause 2. The habendum clause contains two provisions or conditions under which the lease may be extended after three years, which we think are properly divisible as follows: "As much longer thereafter (the three-year period) as" (1) "oil or gas is found therein, or" (2) "said-premises developed or operated."

Leaving out of the case for the present the intent and understanding of the parties as found by the trial judge from the evidence adduced at the hearing, let us examine the entire lease or contract in the light of the well known rules of construction. Where a written contract is complete in itself and the same, viewed in its entirety, is unambiguous, its language is the only legitimate evidence of what the parties intended by it; the intention of the parties is to be gathered solely from the words used; and courts will not resort to construction, but will enforce the contract according to its terms. Elliott on Contracts, sec. 1510; 13 Corpus Juris, 530. But this rule has no application here, for the reason that the contract is somewhat ambiguous, and it is our duty, therefore, to seek to determine, by construction, the intent of the parties as expressed by the words employed by them in their contract, considering the instrument as a whole. Individual clauses and particular words must be considered in connection with the rest of the agreement, and all parts of the instrument and every word in it will, if possible, be given effect. 13 Corpus Juris, 525, 486; Elliott on Contracts, sec. 1514; City of Tecumseh v. Burns et al., 30 Okla. 503, 120 Pac. 270; Brown et al. v. Coppadge et al., 54 Okla. 88, 153 Pac. 817; Union Trust Co. et al. v. Shelby Downard Asphalt Co., 55 Okla. 251, 156 Pac. 903; Hanna v. Mosher et al., 22 Okla. 501, 98 Pac. 358; Mobile County v. Linch (Ala.) 73 So. 423; State ex rel. Davis v. Mortensen, 69 Neb. 376, 95 N. W. 831; Yellow Jack Mining Co. v. Tegarden Bros., 104 Ark. 573, 149 S. W. 518; Doniphan K. & S. R. Co. v. Missouri & N. A. R. Co., 104 Ark. 475, 149 S. W. 60; Mathews v. Modern Woodman of America, 236 Mo. 326, 139 S. W. 151; Jewel Tea Co. v. Watkins (Colo.) 145 Pac. 719; Savage v. Smith, 170 Cal. 472, 150 Pac. 353; Withington v. Gypsy Oil Co., 68 Oklahoma, 172 Pac. 634; Comptograph Co. v. Burroughs Adding Mach. Co. (Iowa) 159 N. W. 465; R. F. Conway Co. v. City of Chicago, 274 Ill. 369, 113 N. E. 703; Canadian Northern R. Co. v. Northern Mississippi R. Co., 209 Fed. 758, 126 C. C. A. 482; Rushing et al. v. Manhattan Life Ins. Co., of New York, 224 Fed. 74, 139 C. C. A. 520.

As so often stated by this and other courts, the cardinal rule of construction is to ascertain what the parties intended and when that intention is found it prevails over verbal inaccuracies, inapt expressions, and the dry words of the stipulations; and it is our duty as far as possible to place ourselves in the position of the parties when their minds met upon the terms of the agreement, and upon a full consideration of the writing itself, its purposes and the circumstances surrounding the transaction to endeavor to ascertain upon what sense or meaning of the terms used their minds actually met. Elliott on Con-

tracts, sec. 1508; Parsons on Contracts (9th Ed.) vol. 2, p. 657; Page on Contracts, sec. 1123; Beach on Contracts, secs. 712, 719; Withington v. Gypsy Oil Co., supra; Kansas City Bridge Co. v. Lindsay Bridge Co., 32 Okla. 31, 121 Pac. 639; Union Trust Co. v. Shelby Downward Asphalt Co., supra; Lamore Gas & Oil Co. v. Doop & Fratter, 39 Okla. 427, 135 Pac. 392; Nelson v. Reynolds et al., 59 Okla. 168, 158 Pac. 301; Brown v. Coppadge et al., supra; 5 Ruling Case Law, No. 239.

Article 2, ch. 12, of our Code contains provisions for the interpretation of contracts. which, in the main, are the well known and well settled rules existing prior to the adoption of the Code. Among these, and one which we think is particularly applicable to the contract under consideration, and therefore, cannot be ignored, is section 951, which is as follows:

"The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the others."

Taking the language "premises developed or operated" in the habendum clause, which, as above stated, is somewhat obscure. what is the proper meaning to be ascribed thereto, viewing the instrument as a whole and measured by section 951, supra? Obviously these words must be construed to mean. either, as contended by the defendants, that within the three-year term oil or gas must be found in the premises and the oil or gas so found be in the process of being taken therefrom, or, as contended by plaintiffs, that the three-year term is extended if drilling operations have been commenced during said term and are still in progress at the expiration thereof. Now, to give the words the construction contended for by defendants·would not give them any field for operation, for the very conditions to which they would attach and under which they would be effective, if thus construed. are fully covered by the previous clause wherein it is provided that the lessee is to hold the premises "as long thereafter (the three-year term) as oil or gas is found therein (in the premises.)" We are not authorized to presume that the parties to the contract employed the words uselessly, but must presume that they were used designedly and for some purpose; otherwise they would not have been incorporated in the agreement. Certainly the language in the second clause was intended to apply to different circumstances from those to which the language in the first clause is applicable. The rule that effect should be given, if possible, to all parts of a contract is generally applied by all the courts,

and we cannot reject this part of the contract if the words will admit of any reasonable and practicable construction that will sustain them as an essential part of the agreement. As stated in State ex rel. Davis v. Mortensen, supra. a construction that will completely emasculate a clause of a contract will not be adopted, if any other reasonable construction is admissible. Nor will any substantive clause be allowed to perish unless unsurmountable obstacles stand in the way. Matthews v. Modern Woodman of America, supra; Parsons on Contracts (7th Ed.) 633. Section 951 of our Code, supra, is practically identical with section 1641 of Kerr's California Civil Code, under which, in Savage v. Smith, supra, the court, in the seventh paragraph of the syllabus, held:

"Under Civ. Code, sec. 1641, providing that the whole of a contract is to be taken together. so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other, an interpretation of a clause, even if not clearly obvious, would have to be adopted in preference to a construction which would deny all meaning to it."

In Rushing et al. v. Manhattan Life Ins. Co., of New York, supra. the Circuit Court of Appeals of the Eighth Circuit, in the body of an opinion by Judge Sanborn, say:

"The sole purpose of the interpretation of a contract is to ascertain the intention of the parties when they made it. If possible every part of a contract must be so construed as to be consistent with every other part and to have effect. It is only when the parts of a contract are so radically repugnant that there is no rational construction that will render them effective and accordant that any part must perish. And the intention of the parties must be deduced, not from specific provisions or fragmentary parts of the agreement, but from the entire contract. because the intent is not evidenced by any part or stipulation of it, nor by the contract without any part or provision, but by every part and term so construed, if possible, as to be consistent with every other part and with the entire agreement."

It necessarily follows that we must give the words the only other interpretation and construction practicable and of which they are reasonably susceptible; namely, that such words were used in the sense of "being developed or being operated;" or in other words, they were intended to mean that if drilling operations were commenced on the premises within the three years for the purpose· of discovering oil or gas and were still being prosecuted in good faith at the expiration of the three-year period, the term was thereby enlarged or extended during the continuance of such drilling operations, or in

the case of the discovery of oil or gas, as long as the same was run. This construction, it seems to us, is the only one that will give any effect to the language used. It is fair and reasonable, and is consistent with the whole agreement, particularly with that related part thereof wherein provision is made for the commencement of a well within one year or the payment of rentals for delay in the commencement thereof.

We have not overlooked the rule stated in the cases cited by counsel that oil and gas leases will be construed most strongly against the lessee who prepared the lease and to promote development, but this rule does not mean that courts should construe the lease in such a way as not to give any effect to the language employed to express the terms agreed upon by the contracting parties. Moreover, it appears from the facts in this case that the lessors would more quickly secure the development of their lands by the plaintiffs who commenced the drilling of a well within the time provided by the lease by permitting said plaintiffs to continue their drilling operations until the test was completed than they would by having the test made by the defendants who could not possibly commence drilling operations until after the expiration of the three-year term. As hereinafter appears, the wells which were being drilled at the expiration of the three-year period were completed and resulted in producers within a short time after the expiration of said period.

Our construction of the lease brings us to the same conclusion reached by the trial court, who found:

"That the phrase, 'or said premises developed or operated,' used in the habendum clause of said lease contract, signifies and it was understood between the parties to mean and was used in the sense of 'being developed or being operated,' and that the habendum clause in said contract in which said phrase is found was used by the parties to mean and does signify as follows:

" 'To have and to hold the same for and during the term of three years from the date hereof, and as much longer thereafter as oil or gas is found therein or said premises are being developed or are being operated.' "

In the lower court the defendants took the position that the clause under discussion was ambiguous, and over the objection of the plaintiffs, who contended to the contrary, the trial court permitted evidence to be introduced by the defendants for the purpose of showing what the parties to the contract intended by the use of the words on which this controversy hinges. The plaintiffs then introduced evidence as to what the parties understood and intended by the use of said words. The court's finding on this question was as follows:

"Upon this issue a great deal of testimony has been introduced by the parties showing the circumstances surrounding the execution of said lease, the conversations between the parties to said lease and between other persons in the presence of the said parties as to the terms and obligations of the lessee under said lease and as to the conversations of the parties subsequent to the execution thereof with respect to the meaning of the terms of said lease, and the court finds, taking into consideration all of the terms and provisions of said lease, and upon said evidence so introduced, that under the provisions of said lease as understood and intended by the parties thereto, it was the agreement and contract between the parties to said lease that if the rentals on said premises were paid in accordance with the terms of said lease, for the privilege of delaying drilling, the lessee and his assignees had the term of three years within which to commence the drilling of a well on the premises covered by said lease, and that they commenced the drilling of a well within said time, and continued diligently and in good faith to drill the same until completed, although the completion of said well and the finding of oil and gas therein did not occur until after the expiration of the said three years, the term of said lease was thereby continued beyond the period of three years."

The findings of the trial court in an equitable action should be sustained unless it appears that they are clearly against the weight of the evidence. Voris v. Robbins, 52 Okla. 671, 153 Pac. 120; Schock v. Fish, 45 Okla. 12, 144 Pac. 584; Tucker v. Thraves, 50 Okla. 691, 151 Pac. 598; Mitchell v. Leonard, 55 Okla. 626, 155 Pac. 696; Thomas v. Halsell 63 Oklahoma, 164 Pac. 458; Rouss v. Crawford, 69 Oklahoma, 170 Pac. 688.

The evidence shows that the lessors were anxious, first of all, to have a test well drilled. This was done according to contract, resulting in the production of oil in paying quantities and the continuous development of the field. They were anxious that the development of their own particular leases take place as soon as possible. They accordingly secured a conditional three-year term lease from the lessee, with $2 an acre rental for delay through the three-year period, whereas the best offer they had received before this time was a five-year lease with $1 per acre rental for delay, and without any agreement to drill a test well. The tracts described by leases of the fifteen lessors generally were expeditiously developed, and wells were being drilled on the leases in question before any objection was made by the lessors that the leases expired at the end of three years whether drilling was in progress or not. It was not until offers of $1,-

000 cash in hand and $20,000 and $25,-000 deposited in escrow, respectively, pending the securing of valid leases, that the defendants ever raised the question of the right of the lessee or his assignees to begin drilling on the lands described in the leases at any time prior to the expiration of the three-year period. Prowant, in a conversation with another lessor at the beginning of the third year of the lease, in urging him to accept his second year's rental, admitted that he thought such acceptance would give the lessee the right to commence drilling at any time before the close of the three years, and, some time during the month of December, 1916, and prior to the end of the three-year period in March, 1917, and after he had been approached for a lease, he called Crockett over the telephone and asked if it was Crockett's understanding that the lease gave the **right** to begin drilling operations any time before the expiration of the third year, and was advised by Crockett that it did. Prowant thereafter did nothing further to show that such was not his understanding until drilling had progressed a considerable time on his premises. Custer did not raise the question at all until considerable progress had been made in drilling on his premises. Both lessors permitted rigs to be erected and drilling to be begun some time in January, 1917, and to progress for considerable time without protest, although they knew from the history of other wells in the vicinity and throughout the field that it was a physical impossibility to complete these wells before the expiration of the three-year period in March, 1917. This practical construction of the contract by the parties is entitled to great weight. 6 Ruling Case Law, sec. 241; Elliott on Contracts, sec. 1537; Pittsburg Vitrified Paving & Building Brick Co. v. Bailey et ux., 76 Kan. 42, 90 Pac. 803; Guthrie Mill & Elevator Co. v. Howe Grain & Mercantile Co., 57 Okla. 613, 157 Pac. 290; Bearman v. Dux Oil & Gas Co. et al., 64 Oklahoma, 166 Pac. 199.

The evidence further shows that the lessors were expecting development on their premises within a reasonable time, and that they had no reason to be disappointed in this respect. The wells on the premises of Prowant and Custer, though begun only a few months before March 10, 1917, were prosecuted with diligence and by the time these cases were tried oil was being produced on both leases in sufficient quantities to have satisfied any reasonable anticipation of the lessors.

Able, elaborate and exhaustive briefs have been filed by counsel representing plaintiffs and defendants, respectively, which makes it impracticable to treat in detail every argument adduced in support of their divergent theories. One of the most vigorous contentions made by counsel for defendants is, as stated in their own language, that "the leases, by their own terms and by the well settled principles of oil and gas mining law, expired on March 10, 1917, and became null and void thereafter." We have already discussed and disposed of this contention.

We do not consider it important to pursue the query put by counsel for defendants as to the length to which a lessee under this particular form of lease could go in holding lands by purported operations. The cases at bar are clearly cases where the contracting parties understood that drilling operations might be begun at any time prior to the termination of the three-year period, provided they were expeditiously prosecuted in good faith to completion. What we might hold under circumstances where the contracting parties had a different understanding or where the lessees or their assignees were not acting in good faith is not relevant to the issues presented by this record.

The remaining assignment of error is that the trial judge was disqualified to sit in the case. We have examined that part of the record which it is claimed supports this contention and it is our opinion that Judge Hickam was not disqualified and there was no reason appearing in the record why he could not fairly and impartially try the issues. The record also shows that he tried the cases fairly and impartially and rendered a proper judgment. At least three of counsel for defendants admitted during the proceedings that he was not disqualified. The record further shows that all the facts now alleged for disqualification were known to the defendants before the trial and although a proper and effective remedy at law was available for the disqualification of a trial judge where such disqualification exists, they made no effort to avail themselves of such remedy. Sections 5812, 5816, Rev. Laws 1910; Fox v. Ziehme et al., 30 Okla. 673, 120 Pac. 285; Myers v. Bailey, 26 Okla. 133, 109 Pac. 820; Ingeles v. McMillan, 5 Okla. Cr. 430, 113 Pac. 998; Ex parte Hudson, 3 Okla. Cr. 393, 106 Pac. 640.

The equities in these cases, we think, are with the plaintiffs, and the finding of the trial court, which we hold is supported by **the evidence, being that the contract, construed as a whole in the light of the intention of the parties who made it, gave the plaintiffs the right to commence drilling any time prior to the expiration of the three-year period, provided the drilling operations were diligently pursued in good faith, and since it has been shown that drilling operations were pursued and consummated in good faith**

from the time they were begun in January, 1917, and that oil was produced and is being produced in paying quantities on the tracts described by the leases in controversy, we hold that the plaintiffs should prevail, and that the injunction heretofore granted by the trial court should be made permanent.

For the reasons stated, the judgment is affirmed.

OWEN, C. J., and KANE, PITCHFORD, JOHNSON, HIGGINS, and BAILEY, JJ., concur; McNEILL, J., dissents; and HARRISON, J., absent.

Dissenting Opinion Filed November 4, 1919.

McNEILL, J. (dissenting). The issue involved in this case is the construction of an oil and gas lease. The record discloses Mr. A. P. Crockett met with some landowners near Yale, Oklahoma, for the purpose of securing oil and gas leases on a large area of land. He was desirous of obtaining leases for a period of five years, while the landowners wanted to give a lease for only two years. A meeting was held at Mr. Prowant's house and it was tentatively agreed that the landowners would execute leases for a period of three years, provided a test well was drilled the first year on one of the tracts of land. Mr. Crockett made a memorandum from which to prepare an escrow agreement that was to be entered into regarding the test well, and returned to Oklahoma City. There he had the leases prepared on blank forms of lease, the form having been prepared prior to that time by Crockett's law partner, who was interested in the leases. An escrow agreement was also prepared. The only changes made in the printed form of the lease was that the printed words "five years" were scratched out and the words "three years" inserted; that as to the rental clause, the word $1 per acre was scratched out and the word $2 per acre payable quarterly in advance was inserted. Mr. Crockett then returned to Yale and the leases were executed.

After the leases were executed, they were assigned by Mr. Crockett to divers parties, who developed the different leased premises, and this controversy arises over the leases executed by Mr. Custer on his tract of land and the one executed by C. M. Prowant on his land. The leases were dated March 11, 1914, and were for a period of three years and would expire March 11, 1917. No oil or gas was found on the premises by March 11, 1917. About sixty days prior to March 11, 1917, the assignees of the lessee erected a derrick on each lease and began drilling for oil. It was conceded on the day drilling began the lessees would not have sufficient time to complete a well to the sand that was producing oil and gas by March 11, 1917

The question involved is, did the leases expire on March 11, 1917? The lease involved is a commercial lease, and very similar to the average commercial form of leases. The habendum clause of the lease contains the following language:

"To have and to hold the same for and during the term of three years from the date hereof, and as much longer thereafter as oil or gas is found thereon or said premises developed or operated."

It is the contention of the plaintiffs in error that the lease by its term expired on March 11, 1917, unless oil and gas had been found thereon prior to said time, and that the words "developed" and "operated" referred to the development or operation of a lease where oil and gas had been found. It is the contention of the defendant in error that the finding of oil and gas was not a condition precedent, but that the commencement of a well prior to March 11, 1917, came within the words "developed or operated." and extended the life of the lease. It is the construction of this portion of the lease that is in controversy.

In the construction of oil and gas leases, this court, and the courts of the different states, have laid down certain rules, to wit:

First. In the construction of oil and gas leases different rules obtain from those applied to the construction of ordinary leases or other mining leases, owing to the peculiar nature of the mineral and danger of loss to the owner from drainage by surrounding wells, the general rule being that oil and gas leases are construed most strongly in favor of the lessor. Superior Oil & Gas Co. v. Mehlin, 25 Okla. 809, 108 Pac. 545; Frank Oil Co. v. Belleview Gas & Oil Co., 29 Okla. 719, 119 Pac. 260; Shaffer v. Marks, 241 Fed. 139.

Second. The principal purpose and design of the parties to an oil and gas lease is the production and marketing of the oil and gas in the land for their mutual benefit. Indiana Oil & Gas Co. v. McCrory, 42 Okla. 136, 140 Pac. 610; Brewster v. Lanyon Zinc Co., 140 Fed. 810; Plummer v. Coal & Iron Co. (Pa.) 28 Atl. 853.

Third. Oil and gas leases in this jurisdiction are construed strongly against the lessee and in favor of the lessor, and where its terms will permit under the rules of law, said lease will be construed so as to promote development and prevent delay. Curtis v.

Harris, 76 Oklahoma; New State Oil Co. v. Dunn, 76 Oklahoma, 182 Pac. 514; Paraffine Oil Co. v. Cruce, 63 Oklahoma, 162 Pac. 716.

Fourth. Where the lease provides that the lessee shall have a specified period of time within which to explore, although the lease may provide that the term shall be as long as rentals are paid or oil or gas produced in paying quantities, yet unless oil or gas is found in paying quantities within the specified period of time, the payment or tender of such rental after the expiration of the definite term will not extend the time. Western Pennsylvania Gas Co. v. George, 161 Pa. 47, 28 Atl. 1004; Bettman v. Harness. 42 W. Va. 433, 26 S. E. 271; Northwestern Ohio Nat. Gas Co. v. City of Tiffin. 59 Ohio St. 420, 54 N. E. 77; Murdock-West Co. v. Logan, 69 Ohio St. 514, 69 N. E. 984; Chaney v. Ohio, etc., Gas Co., 32 Ind. App. 193, 69 N. E. 477; Eaton v. Allegheny Gas Co., 122 N. Y. 416, 25 N. E. 981; Brown v. Fowler, 65 Ohio St. 507, 63 N. E. 76; Cassell v. Crothers, 193 Pa. 359, 44 Atl. 446; Lowther Oil Co. v. Miller-Sibley Oil Co., 53 W. Va. 501, 44 S. E. 433, 97 Am. St. 1027; Brewster v. Lanyon Zinc Co., 140 Fed. 801, 72 C. C. A. 213; Am. Window Glass Co. v. Williams (Ind.) 66 N. E. 912.

Fifth. Leases for oil and gas are subject to the implied covenant that the lessee will do all that is necessary to carry into effect the purposes and objects of the lease. In the absence of a covenant to begin work within a certain time, there is an implied covenant to begin within a reasonable time. When the lessee commences explorations there is an implied covenant that he will diligently prosecute the search, and if oil or gas is found in paying quantities that he will protect the lines and will develop the territory. Brewster v. Lanyon Zinc Co., 140 Fed. 801, 72 C. C. A. 213; Indiana Oil & Gas Co. v. McCrory, 42 Okla. 136, 140 Pac. 610; Wellsville Oil Co. v. Miller, 44 Okla. 493, 145 Pac. 344.

There is a general rule in the construction of contracts which is as follows:

The primary object of all rules of interpretation and construction of contracts is to arrive at and give effect to the mutual intention of the parties as expressed in the contract when not forbidden by law. It must be borne in mind that all applicable laws, when an agreement is made, necessarily enter into and form a part of it as fully as if they were expressly referred to, or incorporated in its terms. Elliott on Contracts, vol. 2, p. 776; Armour Packing Co. v. United States, 153 Fed. 1, 14 L. R. A.

(N. S.) 400; Metropolitan Life Ins. Co. v. Johnson (Ind.) 94 N. E. 785; Lang v. Straus (Ind.) 7 N. E. 763.

Another rule in the construction of the contracts is "that when there exists an uncertainty or ambiguity as to the meaning of the terms of the agreement and the language used may be attributed to one of the parties thereto, it will be construed most strongly against the party using the language, since he is considered as having chosen the language thereto." Elliott on Contracts, vol. 2. p. 807; sec. 964, Rev. Laws 1910.

Without considering at this time the evidence introduced in the trial of the case, nor the findings of the court, let us examine the lease with the rules set out above, as a guide to assist us in the interpretation and construction to be placed upon the oil and gas leases in question. With this in mind, what does the sentence, "And as much longer thereafter as oil or gas is found therein or said premises developed or operated," mean, when the rules set out above are applied, and what was the intention of the parties at the time of the execution of the lease? Does the lease provide three conditions to be performed, any one of which will extend the lease beyond the term of three years, that is: First, "finding of oil or gas," second, "or the premises developed," third, "or operated," or does it simply provide one condition to be performed that will extend the lease beyond its term? It surely could not have been the intent of the parties to the lease that the finding of oil or gas without producing the same or operating the premises would extend the life of the lease. There is no contention that simply finding oil or gas, irrespective of the amount found, would extend the lease indefinitely, without any operation, so this portion of the sentence cannot stand alone, unless the court adds to the sentence additional words such as "produced" or "produced in paying quantities," each of which would require the operating of the leased premises. So it must have been intended that the word "operated" refers to operating the premises after oil and gas was found. If you add the words "produced," or "produced in paying quantities," which would it be? Does the word "developed" refer to commencing a well or drilling operations, prior to the time oil or gas is found, or does it refer to the implied covenant, that goes with every lease, that after oil and gas is found the premises shall be developed with reasonable diligence along such lines as will be reasonably calculated to make the extraction of oil or gas from

the leased land of mutual advantage and profit to the lessor and lessee? If this sentence is construed as exacting one condition to be performed for extending the life of the lease and we substitute the word "and" for "or" it will read "and as much longer thereafter as oil and gas is found therein and said premises developed and operated." In construing oil and gas leases the word "and" has often been substituted for the word "or" when used in the habendum clause. Western Penne. Gas Co. v. George (Pa.) 28 Atl. 1004; Bettman v. Harness (W. Va.) 26 S. E. 271; American Window Glass Co. v. Indiana Nat. Gas & Oil Co. (Ind.) 76 N. E. 1006; American Window Glass Co. v. Williams (Ind.) 66 N. E. 912.

In the case of Bettman v. Harness, supra, the court used the following language:

"Here is a clause annexed to the clause continuing the lease which will insure the rent, if we give the word 'or' the meaning of 'and.' Words must serve intention in the construction of contracts. Story, Cont. 773, 774. These words 'or' and 'and' are so often used inexactly that the one will be read as if the other had been used, to serve the plain intent. It is done in the construction of wills. (Schuler, Wills, 477) and in the construction of statutes (Suth. St. Const. 252); and if the words of a wise legislative assembly must yield to intention, why not the words of two men not so learned and exact? The intention is the question in all these cases. Bish. Cont. 383, says it can be done in the construction of contracts. Likewise, 2 Pars. Cont. 497. Just now I notice the case of Petty v. Fogle, 16 W. Va. 497, holding this to be law in this state in construing contracts."

In substituting the word "and" for "or," in my judgment, we have a plain and unambiguous sentence in the lease which, in my opinion, will express the intent of the parties and the interpretation will comply with all the established rules used in the construction of oil and gas leases. It complies with the rule of construction: First, that an oil or gas lease for a definite term of years terminates at the time provided in the lease unless oil or gas is produced therefrom; second, that the finding of oil or gas on the premises is a condition precedent to the extending of life of an oil or gas lease beyond its term; third, that in addition to finding oil or gas, the premises must be operated and oil and gas produced therefrom; fourth, that if oil and gas are produced therefrom, it contains the implied covenant that there must be further development for properly protecting the lease and carrying out the terms of the lease to the mutual advantage of the parties thereto; fifth, that the

purpose and design of executing an oil and gas lease is the royalty benefits which accrue therefrom to the landowners and the corresponding right to the benefit of the lessee; sixth, that the law applicable to the construction of oil and gas leases would be read into the lease the same as if written therein, and it will be presumed the parties intended that the terms used in said lease would mean and would be construed to mean what they had been construed to mean by the judicial decisions of the various courts and text-writers at that time.

As I understand the position of the defendants in error, it is that by reason of the lease containing the following provision, to wit:

"If a well is not commenced on said premises within one year from the date hereof, this lease shall become null and void, unless the lessee shall pay or tender to the lessors a rental of $2.00 per acre quarterly in advance for each additional one year such commencement is delayed from the time above mentioned for the commencement of said well, until a well is commenced on said land. It is expressly agreed that the right to so extend and continue this lease is fully paid for by the consideration above mentioned, and that said payment or tender, when made, shall fully and completely extend this lease from time to time until a well is commenced. The drilling of a producing well on said premises shall operate as a full liquidation of all rentals due or payable under this provision during the remainder of the term of this lease.

"The completion of drilling operations which result in a dry hole or a well not producing oil or gas in paying quantities shall be in lieu of all rentals accruing from and after the date of the commencement of said operations, for a period expiring one year after the termination of said operations, and this lease shall be in full force and effect for said time as fully as if said rentals had been paid or a producing well completed"

—that, construing both clauses together, that is, the habendum clause and the drilling clause, the lessee had three years to commence a well, and having commenced a well prior to the expiration of the lease, the life of the lease was extended thereby, and that the words "developed" and "operated" referred to commencing a well, but in this construction I cannot agree.

I have been unable to find any decision, nor has a case been cited wherein the courts have decided that the terms contained in the drilling clause of an oil and gas lease extended the life of the lease. The first provision in the drilling clause is: That if no well is commenced within one year the lease becomes null and void unless the lessee

pays a certain rental for each year such commencement is delayed. The force and effect of this clause in the lease has been construed by this court in the case of Melton v. Cherokee Oil & Gas Co., 67 Oklahoma, 170 Pac. 691, the court saying:

"An oil and gas lease containing a stipulation on the part of the lessee to commence operations on the premises within a year from a date certain or pay for delay conferred on the lessee an option to drill or pay, and a failure to do either rendered the same forfeitable at the choice of the lessor."

So if the option to commence a well or the option to pay rentals have the same force and effect, then if the party prior to the expiration of the term of the lease has a right to commence a well and extend the life of the lease, he would have the same right to pay the rental and extend the life of the lease, and no court has ever held that the lease could be extended beyond its terms by paying rental. This clause in the lease is not different from the clauses contained in many commercial forms of leases. The case of Federal Oil Co. v. Western Oil Co., 121 Fed. 674; Indiana Oil & Gas Co. v. McCrory, supra; Eastern Oil Co. v. Holkum, 212 Fed. 126; American Window Glass Co. v. Indiana Natural Gas & Oil Co. (Ind.) 76 N. E. 1006, all used the word "commencement" of operations or well, instead of "completion" of well, although the identical question here presented was not presented in any of those cases.

The next sentence in the drilling clause provides that the right to extend the lease is paid for by the consideration above mentioned and that the payment or tender of rental when made shall fully and completely extend this lease from time to time until a well is commenced. This was the clause that was construed in the case of Rich v. Doneghey, 71 Oklahoma, 177 Pac. 86; Northwestern Oil & Gas Co. v. Branine, 71 Oklahoma, 175 Pac. 533; Shaffer v. Marks, 241 Fed. 139, and was held to mean that the bonus or consideration first paid was a sufficient consideration for the lessee to exercise the option either to drill or pay rentals for the full term of the lease. This clause does not in any way assist in the construction of the habendum clause, nor could it in any way be said that it would be construed to extend the life of the lease, but it has always been held that it did not.

The next sentence provides that the drilling of a producing well on said premises shall operate as full liquidation of all rentals due or payable under this provision during the remainder of the terms of this lease.

This sentence, in my judgment, does not aid or assist in construing the habendum clause, but simply provides that the drilling of a producing well is in full liquidation of all rentals due under the terms of the lease. Instead of this clause aiding the contention of the defendants in error, it seems to me, it weakens their position. If this clause is taken alone, it would be held to mean that a producing well only continues the lease for the three-year period, but if the party only commences the well, the life of the lease might be extended beyond the term of the lease. This was certainly not the intent of the parties.

The next sentence provides that the drilling of a dry hole or a well not producing oil or gas in paying quantities shall be in lieu of the rentals accruing from and after the date of the commencement of drilling operations to one year after the termination of the drilling operations and the lease shall be in full force and effect from said time as fully as if the rentals had been paid or a producing well completed.

The drilling clause provides that a producing well, as far as this clause is concerned, has the effect of payment of rentals due on the lease. Could it be said that it was intended by the parties that the commencement of a well should give the lessee a greater right than the drilling of a producing well? I cannot believe that such was the intention of the parties, from the reading of this clause, nor can I believe under the proper rule of construction that the drilling clause can be of any benefit in the construction to be placed upon the habendum clause. If we would construe the fact that the commencement of a well as provided in the drilling clause gave to the lessee a greater right than finding a producing well, we would reverse the ruling of this court in the case of Curtis v. Harris, supra, wherein the court said that the lease should be construed to promote development and not prevent delay. While in construing this lease we say that during the three years a producing well had been drilled, it only has the force and effect of paying the rentals, while if we wait and commence a well immediately prior to the termination of the lease, the life of the lease is extended.

A case nearly in point to the one at bar, is the case of American Window Glass Co. v. Indiana Natural Oil Co. (Ind.) 76 N. E. 1006. The lease there contained the following provision:

"For the term of twelve years and so long thereafter as petroleum, gas or mineral sub-

stance can be procured in paying quantities, or the payment hereinafter provided for made according to the terms and conditions attached."

The drilling clause was as follows:

"To commence operating for such drilling or mining purposes within one year from the execution of this lease or in lieu for delay in commencing said operations, and as a consideration of the agreement therein contained, thereafter to pay $36 per annum, payable in advance, each year until such operations are commenced and a well completed."

The court there held that in the habendum clause the word "or" should be read "and," so that the term was limited to twelve years unless oil or gas was procured.

That the producing of oil and gas is a condition precedent to the extending of the life of a lease, is, in effect, the holding of our court in case of Paraffine Oil Co. v. Cruce, supra.

In construing the terms of this lease contract, it should not be construed in the light of the facts that have developed since the terms of the lease expired, nor because large quantities of oil and gas have been found on said premises, subsequent to the termination of the lease, but the same should be construed in the light of the conditions as they existed at the time of the execution thereof, when the question of oil and gas was still a possibility, as was said by this court in the case of Rogers v. Harris, 76 Okla. 215, where the court quoted from the case of Gettys Appeal, 80 Pa. St. 461:

"We are not to judge this transaction by the light of subsequent events. It was consummated in the face of an uncertain future. The ebb and the flow of the business tide in that future was concealed from human vision."

If we adopt the construction placed upon this lease by the trial court, in my opinion, we have the lease contract more ambiguous and uncertain than in the first instance. It reads as follows:

"To have and to hold the same for and during the term of three years from the date hereof, and as much longer thereafter, as oil or gas is found therein or said premises are being developed or are being operated."

We then have a sentence providing that the finding of oil and gas extends the life of the lease. Whether necessary to produce the same or to produce the same in paying quantities would still be uncertain. Then the words "or said premises are being developed," would be uncertain as to how long development might occur; whether the

party might drill one or more wells, and if nothing was found therein continue indefinitely to extend the life of the lease. As to what the term "being operated" meant would still be indefinite. In my judgment it would not do to say, because large quantities of oil and gas were found on said premises, subsequent to the term of the lease, therefore it is not necessary to consider the lease in this light. The finding of oil and gas subsequent to the life of the lease would not change the meaning of the words used "more than three years prior thereto," nor would it be any benefit in ascertaining what the intention of the parties was at that time. These facts were unknown at the time of the execution of the lease, and the intention of the parties must be construed as if no oil was found. It would not do to say that if large quantities of oil were found the interest of the parties at the time of the execution of the lease was different from what it would be if only a small well had been found or no oil at all. If we fail to interpret the terms of this lease in this light, then we are permitting, in my judgment, the fact that large quantities of oil or gas had been found, since that time, to influence us in the interpretation of this contract. In my judgment the lease should be so construed that parties with similar leases having controversies over the interpretation could use this as a guide to determine what the lease means, but to a person who has found a small well or no well, it still leaves it uncertain and ambiguous and in my judgment more uncertain and ambiguous than the way the lease was written in the first instance.

I agree with the rule that the lease will be construed to promote development and not delay, but I cannot agree that this fact is determined by the fact that the defendants in error, in the instant case, were drilling at the time fixed for the termination of their lease and were in a position to complete a well sooner than the second lessee could. The construction should be placed on the lease to ascertain what construction would promote development between the parties to the lease, and not the fact that as between two lessees one might drill a well quicker or sooner than another. In my judgment, such a construction would be misleading, and if two lessees were claiming under separate leases, as in the instant case, the court, irrespective of whose lease was paramount, would consider their rights on the theory that the person who obtained possession first, or started drilling first, would have an advantage because it would insure quicker production. I do not believe

this fact should enter into the construction of the lease.

I do not agree with the opinion that the equities in this case are with the defendants in error. The record discloses that these two pieces of land, the Prowant land and the Custer land, are adjacent or nearly so. The evidence of Mr. Faulkner was that he had supervision over the leases for defendants in error, and ordered the locations of the wells to be made thereon. That the Burke-Hoffeld Oil Co. had a lease on the land adjacent to the Prowant land on the north, and the Twin State Oil Co. had a lease on the land adjacent to the Prowant land on the west, and both were drilling offset wells to the Prowant land. He testified further that the Prowant and Custer farms at that time were what were called "wild cat territory." These defendants in error had done nothing to develop these leases prior to that time, if they were wild cat territory, but as soon as the wells adjacent thereto which were drilled by the Burke-Hoffeld Co. and the Twin State Oil Co. showed oil, the defendants in error made locations. As soon as the wells were brought in and showed to be good producers, they immediately began building derricks, which was in January, 1917. No drilling was started until about the middle of January, 1917, and it is admitted they did not have sufficient time to complete a well prior to the three-year period, or, in other words, they were speculating. The Magnolia Petroleum Co. and the Fortuna Oil Co. were holding the leases and speculating on the outcome of the wells drilled by the Twin State Oil Co. and the Burke-Hoffeld Co. If these wells had come in dry, no lawsuit would have been instituted and no well started, but when these wells proved very valuable immediately the defendants in error started drilling.

If these leases expired on March 11, 1917, unless oil or gas had been found thereon, these defendants in error do not bring themselves within the rule of equity, for the reason they stood idly by and permitted other people to drill wells to test these leases and then expect to receive the benefits from the money expended by the parties drilling the wells on the adjacent land to these leases.

A person cannot speculate upon the outcome of an oil and gas lease, and when it becomes very valuable immediately before his lease expires, and he does not have sufficient time to comply with the conditions prescribed in the lease, he cannot commence drilling, and then ask a court of equity to make him a new contract or extend his lease contract without considering the right of the landowners. Of course, if the lease did not expire on March 11, 1917, there are no equities in the case. The defendants in error had until March 11th to begin or commence a well, and they must stand on their contract to determine that question. Equity will not make contracts for parties, nor extend contracts for parties where they have not been diligent in fulfilling the terms of the contract they themselves made. To hold otherwise would be to say: "True, you have waited too long, the lease is now worth $25,000 to the landowner, but we will extend your lease and deprive him of the value of his premises, without any consideration." This equity will not do.

The trial court made certain findings, which are set out in the opinion. The rule adopted by this court is, if the findings and judgment of the trial court in a proceeding of this kind are not clearly against the weight of the evidence the judgment will not be disturbed on appeal. This is true providing the trial court applied the proper rule of construction to the evidence introduced in making his findings. Without going into an elaborate discussion of the evidence, but if we look to the evidence of Mr. Crockett, who obtained the leases and met with the numerous landowners at Mr. Prowant's house, prior to the execution of the lease, his testimony, in substance, was that the landowners wanted to execute a two-year lease with a $2 an acre rental clause, while he wanted a five-year lease with a $1 an acre rental clause, and that they compromised and agreed on a three-year lease. The lease was not before the parties at that time. He stated there was nothing said or discussed about the beginning or completing of a well, except the test well.

The record further disclosed that at the time Mr. Custer signed the lease no discussion was had regarding the commencement or completion of a well, nor on the subject whether the commencement of a well extended the term of the lease. The record further discloses that when Mr. Prowant signed the lease, there was no discussion regarding the commencement of a well prior to the period for which the lease was to extend, nor whether the commencement of a well would extend the lease. The evidence on this point at that time is silent. If we apply the law that was applicable at the time these parties agreed upon a three-year lease, and the time they executed the same, the law was that the lease for a term of years expires at the end of the term, unless

oil and gas had been produced in paying quantities, and we would naturally expect that such was the intention of the parties to this oil and gas lease. When there is practically no evidence on the subject, if we construe their intention as being otherwise, in my opinion, it must be by disregarding the proper rules of construction applicable to oil and gas leases It is admitted that Mr. Crockett's partner drew the lease in question. The landowners had nothing to do with the drafting of the same, so if there is any ambiguity it is construed strongly against the parties who caused the ambiguity, and it should be so construed. When the court in its finding stated that the words "developed or operated" were intended to mean "or being developed," or "being operated," I do not think such finding is supported by the evidence, but contrary to the evidence, nor can such a conclusion be sustained by applying the proper rule of construction to said evidence. If the law at that time was that an oil and gas lease could be extended beyond its terms by paying of rentals, and the ambiguity in a contract should be more strongly construed against the person who does not cause the ambiguity, then the findings would be correct. It is true there is a great amount of other evidence introduced, but very little evidence of any kind or character as to the conversation between the parties to these two leases, and very little evidence of conversations where either of these parties was present. In my judgment, from reading the evidence, in order to support the findings of the trial court, as not being clearly against the weight of the evidence, one must disregard all the rules of construction that have been set out heretofore, that have been used in construing oil and gas leases.

As to the question concerning the trial court being disqualified, I agree with the opinion of the majority.

For the reasons stated, I am unable to concur in the opinion as written, and therefore dissent.